**UNITED STATES DISTRICT COURT**                 **EASTERN DISTRICT OF TEXAS**

| | |
|---|---|
| UNITED STATES OF AMERICA | § |
| | § |
| *versus* | §      CASE NO. 4:06-CR-297 |
| | § |
| PATRICK FITZGERALD KELLY | § |

**MEMORANDUM AND ORDER**

Pending before the court is Defendant Patrick Fitzgerald Kelly's ("Kelly") *pro se* Motion for Compassionate Release (#69), wherein he requests that the court release him from imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(A) due to his medical condition, his desire to take care of his parents, and the threat of the Coronavirus Disease 2019 ("COVID-19"). The Government filed a response in opposition (#72). After conducting an investigation, United States Probation and Pretrial Services ("Probation") prepared a report. Having considered the motion, the Government's response, Probation's report, the record, and the applicable law, the court is of the opinion that the motion should be denied.

I.      Background

On December 14, 2006, a federal grand jury in the Eastern District of Texas returned a four-count Indictment charging Kelly in Count 1 with Possession With Intent to Distribute Methamphetamine, in violation of 21 U.S.C. § 841(a)(1); in Count 2 with Possession With Intent to Distribute Cocaine Base, in violation of 21 U.S.C. § 841(a)(1); in Count 3 with Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c); and in Count 4 with Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). On March 8, 2007, Kelly pleaded guilty to the offense charged in Count 3 of the Indictment pursuant to a Rule 11(c)(1)(C) plea agreement; the court dismissed the remaining counts. Subsequently,

on August 25, 2007, the court sentenced Kelly to an agreed sentence of 240 months' imprisonment, to be followed by a five-year term of supervised release.  Kelly is currently housed at the United States Penitentiary Yazoo City ("USP Yazoo City"), located in Yazoo City, Mississippi.  His projected release date is February 2, 2025.

II.   Analysis

On December 21, 2018, former President Trump signed the First Step Act of 2018 into law.  *See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194.  The Act, in part, amended 18 U.S.C. § 3582(c), which gives the court discretion, in certain circumstances, to reduce a defendant's term of imprisonment:

> (A) the court, upon motion of the Director of the Bureau of Prisons ("BOP"), or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
>> (i) extraordinary and compelling reasons warrant such a reduction; or
>>
>> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A).  This provision is commonly referred to as "compassionate release."

A.    Exhaustion of Administrative Remedies

Prior to the First Step Act, only the Director of the BOP could file a motion seeking compassionate release.  *See United States v. Franco*, 973 F.3d 465, 467 (5th Cir. 2020) ("Prior to the passage of the First Step Act . . . courts lacked the power to adjudicate motions for compassionate release."), *cert. denied*, 141 S. Ct. 920 (2020); *Tuozzo v. Shartle*, No. 13-4897, 2014 WL 806450, at *2 (D.N.J. Feb. 27, 2014) (denying petitioner's motion for compassionate release because no motion for his release was filed by the BOP).  The First Step Act amended § 3582(c) by providing a defendant the means to appeal the BOP's decision not to file a motion for compassionate release on the defendant's behalf.  *United States v. Cantu*, 423 F. Supp. 3d 345, 347 (S.D. Tex. 2019); *United States v. Bell*, No. 3:93-CR-302-M, 2019 WL 1531859, at *1 (N.D. Tex. Apr. 9, 2019).  The plain language of the statute, however, makes it clear that the court may not grant a defendant's motion for compassionate release unless the defendant has complied with the administrative exhaustion requirement.  18 U.S.C. § 3582(c)(1)(A); *United States v. Garrett*, 15 F.4th 335, 337 (5th Cir. 2021) ("[T]o file a proper motion for compassionate release in the district court, a prisoner must first exhaust the available administrative avenues."); *Franco*, 973 F.3d at 467 (holding that the statutory requirement that a defendant file a request with the BOP before filing a motion for compassionate release in federal court "is *not* jurisdictional but that it *is* mandatory"); *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) ("Even though [the] exhaustion requirement does not implicate [the court's] subject-matter jurisdiction, it remains a mandatory condition."); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he exhaustion requirement . . . presents a glaring roadblock foreclosing compassionate release."). Thus, before seeking relief from the court, a defendant must first submit a request to the warden

3

of his facility to move for compassionate release on his behalf and then either exhaust his administrative remedies or wait for the lapse of 30 days after the warden received the request.  18 U.S.C. § 3582(c)(1)(A); *Garrett*, 15 F. 4th at 338 ("[A]n inmate has two routes by which he may exhaust his administrative remedies.  Both begin with 'requesting that the [BOP] bring a motion on the defendant's behalf.'" (quoting *Franco*, 973 F.3d at 467)); *United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020); *United States v. Springer*, 820 F. App'x 788, 791 (10th Cir. 2020) (defendant "was required to request that the BOP file a compassionate-release motion on his behalf to initiate his administrative remedies" (citing *Raia*, 954 F.3d at 595)); *Alam*, 960 F.3d at 833-34; *United States v. Soliz*, No. 2:16-190-3, 2020 WL 2500127, at *3 (S.D. Tex. May 14, 2020) ("§ 3582(c)(1)(A) does not provide this Court with the equitable authority to excuse [defendant's] failure to exhaust his administrative remedies or to waive the 30-day waiting period." (quoting *United States v. Reeves*, No. 18-00294, 2020 WL 1816496, at *2 (W.D. La. Apr. 9, 2020))).

Here, Kelly filed a request for compassionate release with the warden of his facility on December 7, 2020.  In his request, Kelly references his medical condition—namely, an injury to his finger; however, he did not mention the need to care for his parents.  Accordingly, at this time, the court does not have the authority to grant the relief Kelly requests with respect to his family circumstances due to his failure to exhaust his administrative remedies as to that claim.  *See United States v. Dodd*, No. 4:13-CR-182-SDJ, 2020 WL 7396527, at *2 (E.D. Tex. Dec. 17, 2020) (stating that "[i]n order to exhaust her administrative remedies, a prisoner must first present to the BOP the same grounds warranting release that the prisoner urges in her motion").  Nevertheless, even if Kelly had complied with the exhaustion requirement before filing the instant

motion, nothing in his motion indicates that extraordinary and compelling reasons exist to release him from confinement.

      B.    Criteria for Release

The United States Court of Appeals for the Fifth Circuit has held that when a defendant moves for compassionate release, he must establish three criteria. *United States v. Shkambi*, 993 F.3d 388, 392 (5th Cir. 2021).   First, he must meet one of two conditions listed in § 3582(c)(1)(A)—either the defendant has extraordinary and compelling reasons that warrant a reduction under 18 U.S.C. § 3582(c)(1)(A)(i) or the defendant is at least 70 years of age, has served at least 30 years in prison, and meets the additional requirements of 18 U.S.C. § 3582(c)(1)(A)(ii). *Id.* at 391.  Second, the defendant "must show that compassionate release is consistent with the applicable policy statements from the [United States Sentencing Commission ("Commission")]." *Id.* at 392.  Third, the defendant "must convince the district judge to exercise discretion to grant the motion after considering the § 3553(a) factors."[1] *Id.*; *accord United States v. Keys*, 846 F. App'x 275, 276 (5th Cir.), *cert. denied*, 846 F. App'x 275 (2021); *United States v. Cooper*, 996 F.3d 283, 287 (5th Cir. 2021).

Section 3582(c)(1)(A)(i) does not define the "extraordinary and compelling reasons" that may merit compassionate release.  Rather, Congress elected to delegate its authority to the

---

[1] Section 3553(a) directs courts to consider:  the nature and circumstances of the offense and the defendant's history and characteristics; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the need to protect the public; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences and sentencing ranges established for defendants with similar characteristics under applicable United States Sentencing Guideline ("U.S.S.G.") provisions and policy statements; any pertinent policy statement of the Commission in effect on the date of sentencing; the need to avoid unwarranted disparities among similar defendants; and the need to provide restitution to the victim.  18 U.S.C. § 3553(a).

Commission.  *See* 28 U.S.C. § 994(t) (directing the Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"); *Cooper*, 996 F.3d at 287; *Shkambi*, 993 F.3d at 392. Prior to the passage of the First Step Act, the Commission issued a policy statement set forth in U.S.S.G. § 1B1.13, which, along with its commentary, describes what reasons qualify as extraordinary and compelling.[2]  However, § 1B1.13 references only motions filed by "the Director of the [BOP]"—not an individual defendant.[3]  Consequently, the Fifth Circuit has held that when a defendant files a motion for compassionate release on his own behalf, the Commission's policy statement set forth in § 1B1.13 is not applicable because that policy statement governs only motions filed by the Director of the BOP.  *See Cooper*, 996 F.3d at 287-88; *Shkambi*, 993 F.3d at 392.

Nevertheless, while recognizing that they are not binding, the court views the Commission's policy statement contained in § 1B1.13 and the commentary thereto as providing guidance regarding the types of reasons that may be deemed sufficiently "extraordinary and compelling" to warrant compassionate release.  *See United States v. Thompson*, 984 F.3d 431, 433 (5th Cir.) ("Although not dispositive, the commentary to § 1B1.13 informs [the court's] analysis

---

[2] In Application Note 1 to § 1B1.13 of the U.S.S.G., the Commission defined "extraordinary and compelling reasons" to include the following four categories of circumstances:  (i) certain medical conditions of the defendant; (ii) the defendant is 65 years or older and meets other requirements; (iii) the defendant's family has specified needs for a caregiver; and (iv) other reasons in the defendant's case that establish an extraordinary and compelling reason.  U.S.S.G. § 1B1.13 cmt. n.1.

[3] U.S.S.G. § 1B1.13 was last amended on November 1, 2018.  The Commission has, to date, been unable to amend § 1B1.13 to incorporate the changes wrought by the First Step Act due to the lack of a quorum.  The Commission consists of seven voting members and, per statute, requires four members for a quorum to amend the guidelines.  28 U.S.C. §§ 991(a), 994(a).  At present, the Commission has only one voting member.

as to what reasons may be sufficiently 'extraordinary and compelling' to merit compassionate release."), *cert. denied*, 141 S. Ct. 2688 (2021); *United States v. Rivas*, 833 F. App'x 556, 558 (5th Cir. 2020) (upholding denial of compassionate release and recognizing that the court was guided in its analysis by the commentary to U.S.S.G. § 1B1.13).   A review of dictionary definitions also sheds light on the meaning of these terms.   The word "extraordinary" is defined as "going beyond what is usual, regular, or customary . . . exceptional to a very marked extent," whereas the word "compelling" is defined as "forceful . . . demanding attention . . . convincing." *Extraordinary*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2007); *Compelling*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2007); *see United States v. Mitchell*, No. 15-20609, 2021 WL 1827202, at *2 (E.D. Mich. May 7, 2021).   "Courts have interpreted 'extraordinary' in the context of compassionate release as 'beyond what is usual, customary, regular, or common,' and a 'compelling reason' as 'one so great that irreparable harm or injustice would result if the relief is not granted.'"   *Mitchell*, 2021 WL 1827202, at *2 (quoting *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *5 (E.D. Mich. May 15, 2020); *United States v. Sapp*, No. 14-20520, 2020 WL 515935, at *3 (E.D. Mich. Jan. 31, 2020)).

### 1.   Medical Condition

In the instant motion, Kelly, age 51, contends that he is eligible for compassionate release due to his medical condition.   Specifically, Kelly complains that he "injured his finger while playing softball back in September 2018" and that he is still suffering pain from the incident. Although not binding on the court, § 1B1.13 suggests that extraordinary and compelling reasons exist regarding a defendant's medical condition when the defendant is "suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory)" or when a defendant

is "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A).

When interviewed in connection with the Presentence Investigation Report ("PSR"), prepared on April 18, 2007, and revised on May 15, 2007, Kelly reported that he did not suffer from any medical problems and was not taking any medication.  According to his BOP medical records, Kelly has been diagnosed with a deformity of the finger and unspecified abdominal pain. He is not currently prescribed any medication.

Kelly's medical records reveal that he sustained a "crush injury" to his left ring finger on September 20, 2018, "when he was sliding into base while playing softball."  Kelly underwent three surgeries between 2019 and 2020 to correct the issue.  On March 22, 2021, Kelly's physician, William Lineweaver, M.D. ("Dr. Lineweaver"), recommended an additional surgery for "Boutonniere deformity of the ring finger"; however, on May 6, 2021, Kelly signed a medical refusal for the recommended surgery.  Kelly also previously refused additional surgery on his finger on October 21, 2020.  Moreover, Kelly failed to show up for scheduled appointments related to his finger injury on three occasions—November 25, 2019, January 13, 2020, and February 4, 2021.  Further, a medical noted dated July 15, 2020, reflects:

> Inmate had counselor to call over for a request to have his finger evaluated.  Inmate request was granted.  When inmate came to medical, he was asked to have a seat for a moment.  When nurse returned, less than 10 minutes later, inmate had left medical.

In November 2021, Kelly had an abdominal ultrasound and a computerized tomography ("CT") scan of the abdomen/pelvis to assess his reported abdominal pains.  On December 15, 2021, N. Natal-Castro, M.D. ("Dr. Natal-Castro), recorded that the abdominal ultrasound showed "mild fatty infiltration[;] [Helicobacter] Paylori–not detected."  Dr. Natal-Castro also noted that the CT scan was "unremarkable."  Similarly, on February 17, 2022, Kelly's gastroenterologist, Richard Goldberg, D.O., indicated that Kelly's "lab tests were normal."  Furthermore, during a medical encounter on February 14, 2022, Kelly "denie[d] any pain or discomfort" related to his abdominal issues.  Nevertheless, according to a medical note from that day, Kelly's doctor recommended a colonoscopy.

None of Kelly's medical conditions are terminal or substantially diminish his ability to provide self-care, nor do they otherwise present extraordinary and compelling reasons justifying compassionate release.  *See Thompson*, 984 F.3d at 433.  There is no suggestion that his afflictions make him more susceptible to contracting COVID-19 or at risk for suffering from more serious consequences should he be diagnosed with the virus.  Indeed, Kelly is classified as a BOP Medical Care Level 1 inmate.  According to the BOP's Clinical Practice Guidance, dated May 2019, Care Level 1 inmates "are less than 70 years of age and are generally healthy.  They may have limited medical needs that can be easily managed by clinician evaluations every 6-12 months."

In this instance, Kelly's BOP records reveal that he is housed in general population, is ambulatory, has regular duty work assignments, and is cleared for food service.  He is able to provide self-care in the institutional setting and is not limited in his activities of daily living.

Thus, Kelly has failed to establish the existence of medical problems that would constitute extraordinary and compelling reasons to reduce his sentence.

In one of his filings with the BOP, Kelly also claimed that he has a family history of high blood pressure and diabetes. According to Kelly's medical records, however, he does not present with either high blood pressure or diabetes. Kelly's most recent blood pressure reading—129/83 on February 14, 2022—shows that he is merely "at risk" of having high blood pressure.[4] Likewise, Kelly's A1c level of 5.4 on September 23, 2021, indicates that he is not diabetic.[5] Furthermore, Kelly's reliance on his family history of various medical problems to establish extraordinary and compelling reasons for compassionate release is misplaced. A family history of certain afflictions and a fear of developing medical problems do not create a current medical diagnosis, nor do they diminish Kelly's present ability to provide self-care while incarcerated. *See generally United States v. Diggles*, No. 9:15-CR-00024-RC, 2020 WL 6471725, at *3 (E.D. Tex. Sept. 9, 2020), *adopted by* No. 9:15-CR-24-RC, 2020 WL 6450469 (E.D. Tex. Nov. 2, 2020).

### 2.    Family Circumstances

Kelly contends that his family circumstances present extraordinary and compelling reasons that justify compassionate release. As explained above, although the court is not bound by § 1B1.13 or the commentary thereto, the court views the commentary as informative of its analysis

---

[4] According to the Centers for Disease Control and Prevention ("CDC"), a "Normal" systolic level is less than 120 mm Hg with a diastolic of less than 80 mm Hg; the "At Risk" systolic range is 120 to 139 mm Hg with a diastolic range of 80 to 89 mm Hg; and a "High Blood Pressure" systolic level is 140 mm Hg or higher with a diastolic of 90 mm Hg or higher.

[5] A hemoglobin A1c test is a method for measuring blood sugar. According to the CDC, a normal A1c level is below 5.7%, a level of 5.7% to 6.4% indicates prediabetes, and a level of 6.5% or more denotes diabetes.

as to what reasons may be sufficiently extraordinary and compelling to merit compassionate release.  *See Shkambi*, 993 F.3d at 392; *see also Thompson*, 984 F.3d at 433; *Rivas*, 833 F. App'x at 558.  The U.S.S.G. acknowledge that extraordinary and compelling reasons may exist with respect to a defendant's family circumstances, under the following conditions:  (i) "[t]he death or incapacitation of the caregiver of the defendant's minor child or minor children" or (ii) "[t]he incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner."  U.S.S.G. § 1B1.13 cmt. n.1(C)(i)-(ii).  While the U.S.S.G. do not provide a definition of "incapacitation," "[f]or guidance [on what constitutes] 'incapacitation,' courts look to the BOP's non-binding Program Statement for processing compassionate release requests."  *United States v. White*, No. CR16-40, 2021 WL 1721016, at *4 (E.D. La. Apr. 30, 2021); *United States v. Bolden*, No. 16-320, 2020 WL 4286820, at *4 (W.D. Wash. July 27, 2020) (consulting the BOP's relevant Program Statement for guidance); *United States v. Doolittle*, No. 19-501, 2020 WL 4188160, at *2 (D.N.J. July 21, 2020) (same); *United States v. Collins*, No. 15-10188, 2020 WL 136859, at *4 n.13 (D. Kan. Jan. 13, 2020) (noting that although the Program Statement is specifically meant for use by the BOP, it "provide[s] guidance for courts as well").  Kelly does not claim that he has a spouse or registered partner who is incapacitated.  Kelly further makes no claim that his minor children are in need of a caregiver.

Instead, Kelly asserts that he needs to care for his "elderly father and mother."  Aside from mentioning that his father has diabetes, he provides no details or documentation regarding the age, health, or physical condition of his parents.  In this instance, Kelly's desire to care for his parents does not constitute an extraordinary and compelling reason warranting compassionate release.  *See*

*United States v. Phillips*, No. 13-286, 2021 WL 4476819, at *4 (E.D. La. Sept. 30, 2021) (finding defendant's family circumstances did not merit compassionate release and rejecting the notion that the situation was extraordinary and compelling where he claimed his elderly parents were both battling cancer and had no one to care for them); *United States v. McMurray*, No. 3:12-cr-00360-HZ-1, 2021 WL 4473403, at * 2 (D. Ore. Sept. 29, 2021) (denying compassionate release for defendant to care for his mother who suffered from debilitating mental and physical health conditions, was unable to care for herself, lived with significant pain, and other family members could offer only limited support due to their jobs and other commitments); *United States v. Cephus*, No. 2:09 CR 43, 2021 WL 3884829, at *2-3 (N.D. Ind. Aug. 31, 2021) (joining a number of other district courts who were not persuaded that caring for elderly or ill parents constitutes an extraordinary and compelling reason warranting compassionate release and finding that defendant's "aging and sick mother" who had undergone quadruple bypass surgery, suffered from coronary artery disease, and had frequent heart palpitations was not an "extraordinary" circumstance); *United States v. Goldberg*, No. CR 12-180 (BAH), 2020 WL 1853298, at *4 (D.D.C. Apr. 13, 2020) (noting that a desire to care for one's elderly parents does not constitute an extraordinary and compelling reason because "[m]any, if not all inmates, have aging and sick parents." (quoting *United States v. Ingram*, No. 2:14-cr-40, 2019 WL 3162305, at *2 (S.D. Ohio July 16, 2019))).  Like the defendant in *McMurray*, Kelly "committed a serious offense that carried a significant sentence.  A consequence of that sentence is not being available to support family members as he desires."  2021 WL 4473403, at *2.

Moreover, Kelly has not shown that he is the only available caregiver for his parents.  *See Phillips*, 2021 WL 4476819, at *4 (denying compassionate release and remarking that defendant

12

had provided no evidence that he was the only person who could care for his parents where the record reflected that at one time he had several siblings in the area); *United States v. Shabazz*, Crim. Action No. 17-43 (JDB), 2021 WL 4306129, at *3 (D.D.C. Sept. 22, 2021) (denying compassionate release where the defendant had not shown that he was the only available caregiver for his elderly mother, that his release was the only option for his mother's care, or that his situation was so rare as to qualify as "extraordinary"); *United States v. Crandle*, No. 10-35, 2020 WL 2188865, at *4 (M.D. La. May 6, 2020) (denying request for relief and noting that "the court has before it no information as to why other relatives cannot care for [the defendant's] parents"). According to Kelly's PSR, he has an older brother who, at the time the PSR was prepared, lived within an hour of Kelly's parents.  In his motion, Kelly does not demonstrate that his parents are, in fact, in need of assistance or suggest that his brother is not capable of attending to their needs. Hence, Kelly's family circumstances do not amount to extraordinary and compelling reasons for early release from prison.

### 3. COVID-19

Kelly expresses concerns about contracting COVID-19 while in prison.  He maintains that if he contracts COVID-19 it will be fatal for him and, due to prison overcrowding, there is no way to distance himself from other inmates.  Nevertheless, as of May 26, 2022, the figures available at www.bop.gov list 1 inmate (out of a total inmate population of 672) and 1 staff member at USP Yazoo City as having confirmed positive cases of COVID-19, 464 inmates and 24 staff members who have recovered, and 2 inmates who succumbed to the disease.  Thus, it appears that the facility where Kelly is housed is handling the outbreak appropriately and providing adequate medical care.

Although Kelly expresses legitimate concerns regarding COVID-19, he does not establish that the BOP cannot manage the outbreak within his correctional facility or that the facility is specifically unable to treat Kelly, if he were to contract the virus and develop COVID-19 symptoms, while incarcerated.  *See Thompson*, 984 F.3d at 435 ("Fear of COVID doesn't automatically entitle a prisoner to release."); *Raia*, 954 F.3d at 597 ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."); *United States v. Banks*, No. CR 15-0080-02, 2020 WL 6839267, at *4 (W.D. La. Nov. 20, 2020) ("This Court cannot equate the generalized fear of COVID-19 to an extraordinary and compelling reason to support compassionate release, nor will it undermine BOP's criteria to determine eligibility for sentence reductions or home confinement."); *United States v. Vasquez*, No. CR 2:18-1282-S-1, 2020 WL 3000709, at *3 (S.D. Tex. June 2, 2020) ("General concerns about the spread of COVID-19 or the mere fear of contracting an illness in prison are insufficient grounds to establish the extraordinary and compelling reasons necessary to reduce a sentence." (quoting *United States v. Koons*, 455 F. Supp. 3d 285, 292 (W.D. La. 2020))); *United States v. Clark*, 451 F. Supp. 3d 651, 656 (M.D. La. 2020) (finding the defendant had failed to present extraordinary and compelling reasons to modify his prison sentence because he "does not meet any of the criteria set forth by the statute" and he "cites no authority for the proposition that the fear of contracting a communicable disease warrants a sentence modification").  Furthermore, contracting the virus while incarcerated, even in conjunction with preexisting health conditions, is insufficient to establish exceptional and compelling circumstances warranting compassionate release.  *See United States v. Jackson*, No.

14

3:16-CR-196-L-1, 2020 WL 4365633, at *2 (N.D. Tex. July 30, 2020) (finding that defendant had failed to present extraordinary and compelling reasons for compassionate release despite suffering from previous underlying health conditions and testing positive for COVID-19).

Kelly further contends that as an African American, he is part of a racial or ethnic minority group that puts him at a higher risk of serious illness should he contract COVID-19.   In considering Kelly's motion for compassionate release, however, the court must take an "individualized and particularized review" of Kelly's characteristics.  *United States v. Ashley*, No. CR 17-00282-KD-B-1, 2020 WL 7771215, at *4 (S.D. Ala. Dec. 30, 2020) (citing *United States v. Tobias*, No. CR 19-143 (BAH), 2020 WL 4673414, at *5 (D.D.C. Aug. 12, 2020); *United States v. Brown*, No. 13-CR-00030 (ESH), 2020 WL 4346911, at *3 (D.D.C. July 29, 2020); *United States v. Joaseus*, No. 9:16-CR-80011-ROSENBERG, 2020 WL 3895087, at *2 (S.D. Fla. July 10, 2020)); *see United States v. Chavez*, No. 3:18-CR-0426-B-11, 2020 WL 4500633, at *3 (N.D. Tex. Aug. 5, 2020) ("[T]he Court must consider every prisoner individually and should be cautious about making blanket pronouncements." (quoting *United States v. Delgado*, No. 3:17-CR-242-B (01), 2020 WL 2542624, at *3 (N.D. Tex. May 19, 2020))).  In doing so, the court finds that Kelly has not shown that his race elevates his risk of becoming seriously ill from COVID-19 so as to satisfy the "extraordinary and compelling" standard necessary for compassionate release.  *See Ashley*, No. CR 17-00282-KD-B-1, 2020 WL 7771215, at *4 (denying compassionate release where the defendant failed to show that his race elevates his risk of serious illness if he were to contract COVID-19); *see also United States v. Brown*, No. CR 18-20, 2020 WL 6261445, at *3 (E.D. La. Oct. 23, 2020) (finding that an African-American defendant had not shown his age, race, gender, or medical condition met the "extraordinary and compelling"

standard); *United States v. Chambers*, No. CR 18-47, 2020 WL 4260445, at *4 (E.D. La. July 24, 2020) (holding that the defendant's "race do[es] not amount to extraordinary or compelling reasons."); *United States v. Green*, No. CR 05-205,  2020 WL 3642860, at *4 (W.D. Pa. July 6, 2020) (denying motion for compassionate release, explaining that while data suggests that African Americans have been disproportionally affected by COVID-19, it is unclear whether race is an independent risk factor or whether adverse outcomes are caused by other factors); *United States v. Winn*, No. CR H-18-691-8, 2020 WL 3077854, at *2 (S.D. Tex. June 10, 2020) (denying compassionate release of an African-American man who alleged that he was at increased risk of contracting COVID-19 because of his race but who failed to provide support for his concern).

Moreover, the BOP is in the process of administering the COVID-19 vaccine to inmates and staff.  To date, the BOP has administered approximately 318,941 doses of the vaccine. According to www.bop.gov, Federal Correctional Complex Yazoo City, where the defendant is housed, has fully inoculated 3,130 inmates and 466 staff members.  Indeed, according to Kelly's BOP medical records, he received the first dose of the Pfizer-BioNTech vaccine on April 13, 2021, the second dose on May 4, 2021, and a third dose on March 28, 2022.  In the Fifth Circuit and elsewhere, courts have denied early release to inmates with a variety of medical conditions who have been vaccinated for COVID-19.  *See United States v. Walker*, No. 20-cr-20027, 2021 WL 2474088, at *3 (C.D. Ill. June 17, 2021) (holding that because defendant was fully vaccinated, his underlying health conditions—diabetes, heart disease, high blood pressure, asthma, and substance abuse—alone, were insufficient to establish extraordinary and compelling reasons justifying compassionate release); *United States v. Parham*, No. 1:19-CR-133-LG-RHW-1, 2021

WL 1911899, at *2 (S.D. Miss. May 12, 2021) (finding that "generalized concerns of contracting COVID-19[] are not an 'extraordinary and compelling reason'" where the defendant had received the COVID-19 vaccine); *United States v. Meyer*, No 1:14-cr-00148-01-MC, 2021 WL 1895240, at *1-2 (D. Ore. May 11, 2021) (denying compassionate release to inmate with heart disease, obesity, hyperlipidemia, and a history of smoking because he was fully vaccinated and there was a low infection rate at the facility where he was housed); *United States v. Schad*, No. CR 2:17-225-3, 2021 WL 1845548, at *4 (S.D. Tex. May 5, 2021) (denying compassionate release where the defendant had been fully vaccinated against COVID-19); *United States v. Grummer*, No. 08-CR-4402-DMS, 2021 WL 568782, at *2 (S.D. Cal. Feb. 16, 2021) (denying compassionate release and noting that "[a]lthough Defendant suffers from several chronic medical conditions, his vaccination significantly mitigates the risk that he will contract COVID-19"); *United States v. Beltran*, No. 6:16-CR-00004, 2021 WL 398491, at *3 (S.D. Tex. Feb. 1, 2021) (denying compassionate release to a high-risk inmate with myriad underlying medical conditions who received the vaccine, finding that "vaccination significantly reduces [the] risk of contracting COVID-19 or experiencing complications related to a COVID-19 infection"); *accord United States v. Nunez-Arias*, No. CR H-16-436, 2021 WL 1537323, at *3 (S.D. Tex. Apr. 19, 2021).

C.   Section 3553(a) Factors

The court further finds that compassionate release is not merited in light of the applicable factors set forth in 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A) (requiring courts to consider the § 3553(a) factors before granting compassionate release); *United States v. Shorter*, 850 F. App'x 327, 328 (5th Cir. 2021) (finding that the court did not abuse its discretion in denying compassionate release after balancing the § 3553(a) factors); *Keys*, 846 F. App'x at 276;

*Shkambi*, 993 F.3d at 392; *Thompson*, 984 F.3d at 435 n.11 (collecting cases); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).  Kelly's offense of conviction entails his possession of a loaded firearm along with distributable amounts of methamphetamine and cocaine. On November 2, 2006, after observing Kelly participate in a controlled buy with a confidential informant, law enforcement officers approached Kelly.  During a subsequent search of Kelly's person, officers discovered a .22 caliber revolver that was loaded with five rounds of ammunition, 18 bags containing a white powdery substance that field-tested positive for cocaine, a clear bag containing marijuana, a bag containing a crystal-like substance believed to be methamphetamine, various prescription medications, a plastic bottle containing a rock-like substance believed to be crack cocaine, and $596.00 in United States currency.  Additionally, a search of Kelly's vehicle revealed a bag containing a crystal-like substance that field-tested positive for methamphetamine, as well as a Taser X26.  In his factual basis, Kelly admitted that he was in possession of a firearm while he was also in possession with intent to distribute methamphetamine and cocaine base.  The court sentenced him to 240 months' imprisonment in accordance with a plea agreement, while the sentencing guidelines called for a sentence of 262 to 327 months.

Kelly's criminal history includes prior convictions for criminal trespass/terroristic threat, delivery of a controlled substance, and aggravated sexual assault of a child.  Kelly failed to abide by prior terms of probation and parole and was on parole at the time of his offense of conviction. In *Boyd*, the defendant had a similar history of violating probation, including committing the offense of conviction while on probation.  2021 WL 5094903, at *3.  The court found that "defendant's history of violating probation calls into question his respect for the law and whether he would abide by his conditions of supervised release in this case if his motion for compassionate

release were granted." *Id*. This court shares the same concerns in reference to Kelly. Moreover, contrary to Kelly's assertion that he has "stayed out of trouble and done well" in prison, he has incurred 12 disciplinary infractions while in BOP custody, including citations for possession of a hazardous tool, 6 instances of possessing unauthorized items, destroying property worth $100 or less, bribing official/staff member, refusing to obey an order, being in unauthorized area, mail abuse, lying or falsifying statement, giving/accepting money without authorization, and possessing intoxicants. In short, Kelly's "criminal history and conduct reflect an unabated propensity for crime." *United States v. Padilla*, No. H-14-174-1, 2021 WL 1517855, at *5 (S.D. Tex. Apr. 16, 2021).

"Compassionate release is discretionary, not mandatory, and [may] be refused after weighing the sentencing factors of 18 U.S.C. § 3553(a)." *Chambliss*, 948 F.3d at 693; *see United States v. Gharib*, No. 21-40779, 2022 WL 1565352, at *1 (5th Cir. May 18, 2022). Where, as here, a prisoner has engaged in "severe" criminal conduct and has a criminal history, the district court has discretion to deny compassionate release under the circumstances. *Chambliss*, 948 F.3d at 693-94; *accord Gharib*, 2022 WL 1565352, at *1 (refusing to consider the defendant's contention that extraordinary and compelling reasons justified compassionate release due to the defendant's no longer being subject to the career offender enhancement when district court found that the § 3553(a) factors outweighed granting relief); *Keys*, 846 F. App'x at 276 (rejecting Defendant's argument that the court gave too much weight to his criminal history and finding that "a mere disagreement with the court's balancing of the § 3553(a) factors . . . is not a sufficient ground for reversal"). In view of the nature and circumstances of his offense of conviction, his criminal history, and his numerous violations in BOP custody, the court cannot conclude that

Kelly's early release from prison would afford adequate deterrence or protect the public, as he continues to pose a danger to other persons and to the community as a whole.

As the court noted in *United States v. Preston*, "[t]he best predictor of how [Defendant] will behave if he were to be released is how he behaved in the past, and his track record is a poor one." No. 3:18-CR-307-K, 2020 WL 1819888, at *4 (N.D. Tex. Apr. 11, 2020) (quoting *United States v. Martin*, 447 F. Supp. 3d 399, 403 (D. Md. 2020)). Here, Kelly's track record is similarly a poor one. There is no reason to believe that Kelly would not revert to his engaging in criminal activities—namely, the illegal possession of firearms, the distribution of illegal drugs, and the aggravated sexual assault of children—if released from prison at this juncture.

III.    Conclusion

In sum, Kelly has failed to satisfy his burden of showing the necessary circumstances to warrant relief under the statutory framework to which the court must adhere. *See United States v. Dodge*, No. 17-323-01, 2020 WL 3668765, at *5 (W.D. La. July 6, 2020) (stressing that "the rampant spread of the coronavirus and the conditions of confinement in jail, alone, are not sufficient grounds to justify a finding of extraordinary and compelling circumstances"); *Koons*, 455 F. Supp. 3d at 291-92 (same). As the court observed in *Koons*, rejecting the notion that it has "carte blanche" authority to release whomever it chooses, "[t]he Court cannot release every prisoner at risk of contracting COVID-19 because the Court would then be obligated to release every prisoner." *Dodge*, 2020 WL 3668765, at *6; *Koons*, 455 F. Supp. 3d at 292.

Consistent with the foregoing analysis, Kelly's *pro se* Motion for Compassionate Release (#69) is DENIED.

SIGNED at Beaumont, Texas, this 27th day of May, 2022.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE